## BARRETT CO. v. SELDEN CO.

District Court, W. D. Pennsylvania. February 27, 1929.

No. 1781.

R. T. M. McCready, of Pittsburgh, Pa., and Pennie, Davis, Marvin & Edmonds, of New York City (by W. B. Morton and R. B. Canfield, both of New York City), for plaintiff.

Alter, Wright & Barron, of Pittsburgh, Pa. (by Geo. E. Alter, of Pittsburgh, Pa.), R. A. Norton, of Pittsburgh, Pa., and Newell & Spencer, of New York City, for defendant.

GIBSON, District Judge. Plaintiff's bill charges the defendant with infringement of a certain patent owned by plaintiff, and prays injunctive relief and an accounting. The patent in question was No. 1,604,-739, for an improvement in apparatus for promoting catalytic reactions, which had been issued to Charles R. Downs on October 26, 1926. The application therefor had been filed on December 5, 1921.

The main object of the patentee was, by means of his device, to keep under control the temperatures of catalytic reactions, such as the creation of phthalic anhydride by the partial oxidation of naphthalene in the presence of a catalyst. Reactions of this nature occur only when the catalyst and organic substance passed over or through it are heated to a high degree, and are successful only if the temperatures of the reactions are confined within very narrow limits. If the catalyst and contact material are insufficiently heated, the reaction either does not take place at all or the product is inferior. On the other hand, if the materials are of the temperature favorable to a proper reaction, great care must be taken to dissipate the surplus heat created in the process itself, as otherwise the catalyst will be fused, and the material passing over it will be entirely destroyed instead of being partially oxidized, as desired. The patented converter was designed to solve this problem in commercial manufacture. By the patent drawings and specifications is disclosed, among other forms, a vessel similar in shape to the ordinary steam boiler. From the bottom of an entrance chamber for the materials of the reaction, at the top of the vessel, to the top of the cone-shaped bottom, a large number of ¾-inch square tubes are placed, the tubes being open at top and bottom. At the lower end a wire screen is placed, its function being to hold the catalyst which is placed in, but only partly fills, the tubes. Each of these tubes is separated from each of its immediate neighbors by a very small space. Surrounding them, to a height just a little greater than that of the catalyst, is a bath of mercury, or similar liquid. Connected with the boiler-shaped part of the device is an air-pressure system by which the normal atmospheric pressure upon the mercury may be either raised or lowered, thus enabling the normal boiling point of the surrounding liquid to be either raised or lowered. Attached to the boiler part of the device, also, is a reflux condenser. An external heater has been provided for the purpose of heating the liquid to the reactive temperature at the start of the operation.

The soul of the device is the well-known physical fact that liquids absorb latent heat without change in temperature after they have reached the boiling point. At the time the problem of the patentee was in process of solution, he was chiefly interested in improving the method of manufacturing phthalic anhydride, and his invention, as presented in the patent application, is most specifically applicable to the production of that article, and its workings are well shown in its manufacture. The temperature at which the phthalic reaction takes place is slightly higher than 357° C., the boiling point of mercury. Mercury was therefore adopted in its manufacture as the liquid surrounding the catalyst tubes. After the liquid bath has been heated to the boiling temperature, and the catalyst also, a mixture of vaporized napthalene and air, prepared outside the converter, is introduced under pressure into the entrance chamber at the top of the converter. The pressure upon the mixture forces it uniformly through the catalyzer tubes. The vapor has been heated somewhat prior to introduction into the converter, and in its passage through the tubes is further heated by the mercury vapor and is of the temperature of the reaction when it reaches the catalyst (a substance which, for some unknown reason, upon contact, initiates the reaction without entering into its result or losing its own form in any material respect). As the vapor is forced through the catalyst at the proper temperature, a great quantity of heat is created, but, owing to the intimate heat-interchanging relation between the catalyst and the mercury bath, the boiling mercury absorbs the excess heat without raising its temperature, and the napthalene mixture, passing through the catalyst, is oxidized to the extent desired and is deposited in the conical bottom part of the converter in the form of phthalic anhydride chrystals. The mercury vapor, which rose from the boiling mercury and

heated the entering reaction material, rising to the reflux condenser, is condensed and is returned to the body of the bath at practically the same temperature as the boiling mercury. After the bath has been heated to the proper temperature, the reaction is practically continuous and automatic. To get the best results, particularly after the catalyst has been in use for some time, increase of the boiling point of the mercury by pressure is necessary.

The thirty-one claims of the patent may be divided into four groups: First, those broad claims which set out a two-phase liquid-vapor system for regulating the temperature in a catalytic chamber, and which do not specify the liquid to be used nor any means for varying its boiling point by pressure or vacuum; second, those claims which include, in addition to the features just mentioned, a change in the normal boiling point of the liquid by means of pressure upon the liquid; third, those which specify mercury as the liquid to be used; and, fourth, that one claim which sets forth a specific proportion between the cubic bulk of the catalyst and the surface of the surrounding liquid. It will be noted, also, that some of the claims set forth means for condensing the vapor from the boiling liquid and returning it so condensed to the body of the boiling liquid, while other claims do not assert the use of such means.

We quote one claim from each group:

"2. A catalytic apparatus comprising a catalytic chamber and a two-phase liquid-vapor temperature regulating system for regulating the temperature in said catalytic chamber whereby the desired chemical reactions may be promoted, and means for condensing and returning liquid vaporized in said system."

"7. A catalytic apparatus comprising a catalytic chamber, a two-phase liquid-vapor temperature regulating system for regulating the temperature in said catalytic chamber of the apparatus whereby the desired chemical reactions may be promoted, means for condensing and returning the liquid vaporized in said system, and means for regulating the pressure and thereby the boiling point of the liquid in said system."

"23. A catalytic apparatus for carrying out exothermic gas phase catalytic oxidation reactions of organic compounds, comprising a catalyzer chamber or compartment containing a catalyst adapted for such oxidation reactions, a temperature regulating system having a liquid-containing compartment in heat interchanging relation with the catalyst in the catalyzer chamber whereby the desired chemical reactions may be promoted, and a definite quantity of liquid mercury circulating in a closed circuit in such system, whereby the heat of the exothermic action is absorbed by the boiling of the mercury at a temperature approximating that of the catalytic reaction."

"20. A catalytic apparatus comprising a catalyzer chamber or compartment, a two-phase liquid-vapor temperature regulating system with its liquid-phase in heat interchanging relation with the catalyst in said chamber, and such system being so distributed with respect to the catalyst that all of the parts of the catalyst are subjected to the temperature regulating influence of the same, and the ratio of the surface of the liquid-phase of the system to catalyst bulk being such that more than three square inches of surface are represented for each cubic inch of catalyst bulk."

The evidence of the instant case plainly shows that defendant's converter, in use at the institution of the action, is exactly covered by the claims of the Downs patent. An examination of the drawing of its converter submitted by defendant, in connection with the patent drawings, will disclose that the two converters are substantially identical. As a matter of fact, the testimony shows defendant's construction was copied from that of the plaintiff. When plaintiff's converter was first built and operated in the plant of the plaintiff company, Frank A. Canon, a chemical engineer, was in its employ and had full knowledge of the plan and operation of its new converter. In the latter part of 1921 the plaintiff reduced the number of its employees in its research department, and, among others, allowed Mr. Canon to go. He sought employment from several chemical manufacturers, and was employed by the defendant company about November 10, 1921, about 10 days after he ceased to be employed by plaintiff. He immediately began to draw a plan for a converter, based upon his knowledge of the Barrett Company construction. About the only change made was from a square to a round boiler form, which latter form, however, is shown in the patent drawings, and has been also adopted by plaintiff in building its later converters. The defendant proceeded to build a number of converters in accordance with Mr. Canon's plans. It is fair to the plaintiff and Mr. Canon to state that the application for the patent in suit was not filed for more than a month after Canon left the plaintiff's employ, and that

when he so left he had the impression, obtained from some of his superiors, that no application would be made; and the testimony does not disclose any knowledge of the patent on the part of defendant until notice of infringement was given it shortly prior to suit.

Defendant operated the converters built under Canon's direction until shortly after the beginning of this action, when it made several modifications. It now uses an alloy of mercury which boils at a somewhat higher temperature than mercury, and finds it unnecessary to use air pressure upon the boiling liquid. In its later converters it has inserted round catalyst tubes of the same size instead of square tubes. It was enabled to do this by reason of its alloy bath being much cheaper than mercury. The only function of the square tubes, as compared to round, was in the fact that their use lessened the amount of expensive mercury which was necessary. The essential ideas of plaintiff's patent have all been included in defendant's converter.

Infringement of plaintiff's patent by defendant's converter may be determined without difficulty; but quite different is the solution of the vexed question as to the validity of the patent. Examination of the prior related art, as it appears in defendant's evidence, seems to make it plain that in no one feature of plaintiff's patented device is anything new presented. All the physical and chemical principles involved were well known prior to the application for the patent. No claim has been made, or could have been, to the discovery of the method of producing phthalic anhydride by the partial oxidation of naphthalene vapor in the presence of a catalyst. That liquids absorb latent heat without change in temperature after they have reached the boiling point was long known. The regulation of heat and maintenance of a constant temperature by means of a boiling bath was far from new; and the utility of mercury as the liquid to be so used was recognized. It was long known, too, that the boiling point of the liquid bath could be considerably raised or lowered by increasing or decreasing the air pressure upon the bath. And just as well known was the function of the condenser-attachment to plaintiff's converter. The attenuated catalyst tubes of the plaintiff's converter present a feature essential to its effectiveness, but no claim of invention has been, or well could be, based upon this feature. One claim of the patent (No. 20) specifies that for each cubic inch of

catalyst the liquid bath shall present more than three square inches of surface. This provision would require either attenuated tubes or a large bath surface. If we consider those narrow claims of the patent which specify mercury as the liquid of the boiling bath, the items of weight and expense would necessitate small tubes for the catalyst. Even though we should read the element of tube size into the patent claim, however, it would present nothing undisclosed in the prior art. In the Lane British and French patents (offered as throwing light upon the prior art) which describe a boiling bath converter for use in catalytic reactions, the patentee specifies catalyst tubes "not exceeding 2″ diameter," and, as a reason for this limitation, states that heat cannot accumulate in the attenuated catalyst tubes to any injurious extent.

In several of the claims, No. 10, for example, the patentee has stressed the use of the vapor from the boiling liquid to heat the entering reaction mixture to the temperature of the reaction. This feature is new, at least to the extent that no prior inventor has mentioned it as an important part of his device, but we may be pardoned, we trust, for speculating as to just how much of invention is found in such use. The entering gas, before it reaches the catalyst, in exothermic reactions, is heated, in large part, by the heat thrown off by the catalyst. Several patentees, prior to Downs, have only partly filled their catalyst tubes, to make use of such heat; and if additional heat were required, an increase in the height of the liquid bath would produce the same result as the rising vapor. However, this increase in the height of the bath would doubtless be impracticable where the liquid used was boiling mercury or other like molten material.

Each of the individual features of the Downs patent appears in the prior art. Certain patents or printed articles disclose devices which combine several of such features. The defendant has pleaded, as anticipations of the Downs converter patent, Conover patent, No. 1,324,443, an article in book by Franz Wilhelm Henle, Edition of 1909, and French patent, No. 520,464, granted to Georges Claude, on February 15, 1921. The Conover, Henle, and Claude devices, the plaintiff contends, each set forth all the essential features of the Downs construction.

The Claude patent was rejected by the court upon trial on the ground that it could not be considered an anticipation, as the Downs converter had been in actual com-

mercial use long prior to the publication of the Claude patent. It provides a liquid bath of a high boiling point, in common with the Downs device, but is designed for the production of very small quantities of the reaction product, and except for its bath has little resemblance to the Downs patent.

The Conover patent, No. 1,324,443, for which application was made on April 30, 1919, upon merely casual examination, seems to present the basic ideas applied in plaintiff's structure. It presents a number of horizontal catalyst chambers, entrance to which by the material of the reaction is through an entrance chamber. The reaction chambers are surrounded by liquid-containing chambers which belong to a circulating system in which are condensers and cooling reservoirs. The liquid, passing through its chambers, is heated, and, upon boiling, gives off vapors which pass to the condenser, and thereupon are returned, as cooled liquid, to the liquid jackets surrounding the reaction chamber. From a merely verbal description of Conover's patented device, it would seem that it was designed to operate along very similar lines to those of the Downs converter, with the exception that no means is provided to raise or lower the boiling point of the circulating liquid. An examination of the drawings of the Conover patent, and a careful reading of the specifications, will make it plain that Conover did not have in mind the features which make Downs' converter a success. Downs desired to maintain the temperature, without change, within the narrow limits necessary for the success of the continuous reaction. He brought this about by absorbing the heat of the catalyst in the boiling liquid, while heating the in-coming reaction material with the vapor thrown off, and then condensing the vapor and returning it to the bath in the form of liquid at its approximate boiling point. Conover appears to have had in mind only the cooling of the catalyst, and not the automatic confinement of the temperature within the narrow limits necessary to the success of the reaction, as did Downs. He contemplated a circulation of the liquid by which the hot liquid and vapor in the liquid chamber were replaced by the cooled liquid. In other words, Conover had in mind the limitation of the maximum temperature, while Downs regulated both the maximum and the minimum. Conover's conception was entirely mental, and never has been put upon trial by any attempt to follow out his idea by the construction of a commercial converter based

thereon. We are therefore confined to the specifications of his patent both for our conception of the scope of the patentee's idea, and our impressions as to the practicability of his proposed construction. The patent plainly does not disclose the automatic heat regulation of the Downs converter. The drawings make it quite plain that the inventor did not contemplate the use of mercury, or like material, as the liquid surrounding the catalyst chamber, and without some such material, having a boiling point close to the temperature of the reaction, the results of the Downs converter, at least so far as the production of phthalic anhydride is concerned, are not attainable.

The Conover patent does not, we think, set forth all of the essential features of the Downs patent, or an operative invention; but even if we should have reached a contrary conclusion, we should feel compelled to reject it as an anticipation. The application of Conover was filed on April 30, 1919, and the Downs application not until December 5, 1921; but the testimony establishes the fact that Downs had conceived the essential features of his invention prior to Conover's application and constructive reduction to practice of his converter. On January 31, 1919, he dictated a description of his proposed converter which contains all the essential ideas of his ultimate construction. In his mental conception, however, he contemplated putting mercury grids at intervals throughout the catalyst; that is, the catalyst surrounded the mercury tubes instead of the mercury bath surrounding the catalyst tubes, as in the patent construction. Some phthalic anhydride was made from converters made pursuant to this original idea, but the results were not entirely satisfactory, and continuous labor and experiment finally resulted in the present form of converter, which, despite the transposition of the mercury and the catalyst, is the direct and natural outgrowth of the original conception dictated in January, 1919.

The Henle article, cited as an anticipation, discloses a laboratory apparatus wherein a reaction mixture is passed through a single catalyst cartridge, the resultant product of the operation described being hexahydrobenzol. The cartridge is placed in a Volhard petroleum furnace, a small copper cylindrical boiler, wherein was a copper tube which contained an iron tube that, in turn, contained the glass tube which held the catalyst. The copper boiler contained an oil bath, which, in the experiment described,

was heated to a temperature of 195°. The apparatus was supplied with condenser tubes. The boiler was continuously heated by a gas flame during the reaction.

The Henle article, describing the production of a small quantity of hexahydrobenzol, makes no mention of the absorption of any excess heat. We may possibly assume that the reaction was exothermic by reason of the use of condenser tubes, although the function of such tubes may have been to preserve the amount of boiling kerosene in the boiler rather than to dissipate the heat. The latter theory is supported by the fact that the Henle apparatus disclosed no means for the rapid transmission of heat from the catalyst to the kerosene bath. The catalyst was in a glass tube which was contained in another tube of iron. An air space separated the iron tube from one of copper, which was in contact with the kerosene bath. Under such an arrangement, the heat would be very slowly transmitted from the catalyst to the bath, and this fact would seem to indicate that the heated kerosene bath was used only to supply needed heat to the reaction. Whatever the purpose, it is plain that Henle, in his single laboratory tube, did not have the problem which confronted Downs in his manufacture of phthalic acid in commercial quantities. In the first place, Henle's reaction, if exothermic to any extent, was not accompanied by the high temperatures incident to the contact of naphthalene vapor with the catalyst, nor did Henle have Downs' problem of maintaining within narrow limits the high temperature of the reaction by absorbing the very great heat thrown off by a thousand catalyst tubes and at the same time heating the naphthalene vapor on its way to the catalyst. True, the multiplication of the elements of an apparatus, each complete in itself, ordinarily does not constitute invention; but the multiplication in the Downs converter was necessary to commercial success, and presented a problem in temperature regulation quite different from that which faces the constructor of a mere laboratory device. Passing over the distinction between laboratory and commercial structure, however, the Henle apparatus has little in common with the Downs converter. It is a device used in a continuing catalytic reaction, as is the Downs structure, but the operation is made continuous in the Henle apparatus by the continued application to the boiler of the heat which first raised the kerosene bath to the temperature of the reaction, while in the Downs converter, after the mercury and catalyst have been raised to the temperature of the reaction, the heat created by the reaction itself keeps the mercury at its boiling point and automatically continues the operation, wherein the boiling mercury acts both as a heating and cooling means. The heating of the reaction mixture prior to contact with the catalyst—an important feature of the Downs patent—is missing in the Henle apparatus. Not to continue the enumeration of points of difference, in our judgment, no chemical engineer in 1909 (the approximate date of the Henle article), without the exercise of invention, would have been able to construct any commercial apparatus for highly exothermic catalytic reactions which was based upon the principles of the Downs converter.

As previously stated, no individual feature of the patent in suit represents a discovery in physics or chemistry. It does not follow, however, that because the designer of the patented converter has used materials and principles well known to those versed in chemical reactions, his construction is devoid of invention. Old elements may be combined in such a way that a new and valuable result is obtained. The patentee in the instant suit made no startling discovery in chemistry, but he did produce a converter which was new, and which vastly increased the ability to manufacture phthalic anhydride. The facts established by the testimony are sufficient, it would seem, to overcome defendant's contention that the plaintiff's device was the result of only ordinary chemical engineering skill. The patentee, Downs, was an experienced chemical engineer engaged in research work. He completed his converter only after numerous experiments and long pursuit of his basic ideas. The defendant had in its organization able chemical engineers, one of them Mr. Conover, the inventor of a converter which is alleged to have anticipated Downs. These engineers had not been able to build a converter which compared in efficiency with that of Downs prior to the time when the latter put his device into actual use. At least, prior to Downs, the defendant used a form of converter by which it produced 70 to 75 pounds of phthalic acid per day from each converter; and upon becoming acquainted with Downs' form, it promptly replaced its type of converter with the new form, and thereafter was able to produce 750 to 800 pounds of greatly improved quality. In view of defendant's adoption of plaintiff's device, and the results of that ac-

366

tion, seemingly it is not in a position to deny that Dr. Downs produced a converter that was both novel and valuable in the art.

We find the plaintiff's patent to be valid, and infringed. Let a decree be drawn in accordance to such finding.